## NO. 16-3469

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

**TABITHA TRIPP, GARY SHEPHERD, CHARLIE HOWE, FELICIA VERO, HOLLY VERO, RENEE COOK, CANDACE A. DAVIS, and ILLINOIS GREEN PARTY,**
 **Plaintiffs-Appellants,**
**v.**

**CHARLES SCHOLZ, in his official capacities as the Chairman of the Illinois State Board of Elections and Member of the State Officers Electoral Board, ERNEST L. GOWEN, in his official capacities as Vice-Chairman of the Illinois State Board of Elections and Member of the State Officers Electoral Board, BETTY J. COFFRIN, CASSANDRA B. WATSON, WILLIAM M. McGUFFAGE, JOHN R. KEITH, ANDREW K. CARRUTHERS, and WILLIAM J. CADIGAN, in their official capacities as Members of the Illinois State Board of Elections and Members of the State Officers Electoral Board, and STEVEN S. SANDVOSS, in his official capacity as the Executive Director, Illinois State Board of Elections,**
 **Defendants-Appellees.**

**Appeal from the United States District Court
for the Southern District of Illinois
Case No. 14-CV-890
The Honorable Michael J. Reagan, Judge Presiding**

# PETITION FOR PANEL REHEARING & EN BANC
# OF PLAINTIFFS-APPELLANTS

Vito A. Mastrangelo
PO Box 1253
Mt. Vernon, IL 62864
618-316-9886   VitoAMastrangelo@gmail.com
Attorney for Plaintiffs-Appellants

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 16-3469

Short Caption: Tripp et al., Plaintiffs-Appellants v. Scholz, Defendants-Appelles

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[  ]  **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Tabitha Tripp, Gary Shepherd, Charlie Howe, Felicia Vero, Holly Verno, Rennee Cook, Candace A. Davis,

and Illinois Green Party

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Vito A. Mastrangelo, Attorney at Law

(3) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

Attorney's Signature: s/ Vito A. Mastrangelo    Date: October 20, 2017

Attorney's Printed Name: Vito A. Mastrangelo

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes  X   No

Address: P.O. Box 1253, Mt. Vernon, IL 62864

Phone Number: 618-316-9886    Fax Number: N/A

E-Mail Address: VitoAMastrangelo@gmail.com

rev. 01/15 GA

## STATEMENT IN SUPPORT OF REQUEST FOR REHEARING EN BANC

This appeal includes, among others, the question of whether or not the State's claimed interests in avoiding voter confusion, ballot overcrowding, and frivolous candidates must be supported by any evidence.

On this point, the Panel's Opinion, relying on *Navarro v. Neal*, 716 F.3d 425, 432 (7th Cir. 2004), states that "the mere 'speculative concern that altering the challenged signature requirement would lead to a large number of frivolous candidates qualifying for the ballot and, consequently, voter confusion is sufficient." Opinion at 15-16.

However, other judges and courts have stated that evidence is required for the interest to be entitled to significant weight, including (a) relatively recent concurring and dissenting opinions in a Supreme Court decision, which garnered the support of three Justices and two Justices, respectively, and (b) a federal Court of Appeals. *Crawford v. Marion Co. Election Bd.*, 553 U.S. 181 (2008) (Scalia, concurring in the judgment; Souter, dissenting); *Bergland v. Harris*, 767 F.2d 1551, 1554 (11th Cir. 1985); *Fulani v. Krivanek*, 973 F.2d 1539, 1546 (11th Cir. 1992) ("The problem is that the state has plucked these interests from other cases without attempting to explain how they justify the discriminatory classification here at issue). This issue is discussed in Section II, *infra*.

Rehearing en banc is therefore suggested because this appeal involves a question of exceptional importance—a conflict with Supreme Court opinions and also decisions of the 11th Circuit Court of Appeals.

# TABLE OF CONTENTS

APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT. . . . . . . . . . . . . . . i

STATEMENT IN SUPPORT OF REQUEST FOR REHEARING EN BANC. . . . . . . . . . ii

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

MAJOR POINTS OVERLOOKED OR MISAPPREHENDED.. . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.    A 5%-minimum-signature requirement is not a safe haven--it has been held to be
      unconstitutional by other courts, and under the circumstances in this case, it
      should be held unconstitutional here... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   If the State's interest in avoiding ballot overcrowding need not be supported by
      any empirical or other justifying evidence, then using it to reject a challenge to
      ballot access laws is using a litmus test.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.  "Factual Dispute" Regarding District Boundaries in McLeansboro & Anna. . . . . . 8

IV.   The Panel's Opinion overlooks additional evidence of discriminatorily drawn state
      representative district boundaries, understates other such evidence, and
      overstates other evidence... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

V.    The Panel's opinion misapprehends the nature of the Plaintiffs' argument
      regarding political gerrymandering... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

VI.   The notarization requirement is a heavier burden for new parties... . . . . . . . . . . . 11

VII.  Cumulative Effect & the Balancing Test. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

CERTIFICATE OF FILING & SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Anderson v. Celebrezze*, 460 U.S. 780, 787 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 18, 19

*Bergland v. Harris*, 767 F.2d 1551, 1554 (11th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . 1, 9, 11

*Bullock v. Carter*, 405 U.S. 134, 143 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Burdick v. Takushi*, 504 U.S. 428, 438 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Clements v. Fashing*, 457 U.S. 957, 964-65 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Crawford v. Marion Co. Election Bd.*,  553 U.S. 181 (2008) (Scalia, concurring in the
judgment; Souter, dissenting). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 9, 10

*Eu v. San Francisco County Democratic Cent. Comm.*, 489 U.S. 214, 222 (1989) . . . . . . . . . 18

*Fulani v. Krivanek*, 973 F.2d 1539, 1546 (11th Cir. 1992) .. . . . . . . . . . . . . . . . . . . . . . . . 1, 9, 11

*Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340 (N.D. Ga. 2016). . . . . . . . . . . . . . . . 5

*Hall v. Merrill*, 212 F. Supp. 3d 1148 (M.D. Ala. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Jenness v. Fortson*, 403 U.S. 431, 441-42 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Libertarian Party of Ill. v. Rednour*, 108 F.3d 768, 773 (7th Cir. 1997). . . . . . . . . . . . . . . . . 5

*Libertarian Party v. State Election Bd.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Lubin v. Panish*, 415 U.S. 709, 716 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*McLain v. Meier*, 637 F.2d 1139 (8th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Munro v. Socialist Workers Party*, 440 U.S. 173, 195 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Navarro v. Neal*, 716 F.3d 425, 432 (7th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Norman v. Reed*, 502 U.S. 279 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*Rockefeller v. Powers*, 78 F.3d 44 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Storer v. Brown*, 415 U.S. 724, 730 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## STATE STATUTES

10 ILCS 91/20. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

10 ILCS 5/10-4, 3-1.2.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

S.D. Codified Laws § 12-5-1.4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

 Utah Code Ann. § 20A-9-201. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## MAJOR POINTS OVERLOOKED OR MISAPPREHENDED

I.     A 5%-minimum-signature requirement is not a safe haven–-it has been held to be unconstitutional by other courts, and under the circumstances in this case, it must be invalidated here.

II.    If the State's interest in avoiding ballot overcrowding need not be supported by any empirical or other justifying evidence, then using that purported, unsupported interest to reject a challenge to ballot access laws is, in practice, using a litmus test.

III.   The Panel's opinion references a "factual dispute," in Footnote 2 on Page 5, regarding the impact of redistricting on the communities of Anna and McLeansboro.  However, the record demonstrates that both population centers are split, supplying additional support for the Plaintiffs' argument that the challenged ballot access restrictions are unconstitutional.

IV.    The Panel's Opinion overlooks additional evidence of discriminatorily drawn state representative district boundaries, understates other such evidence, and overstates other evidence.

V.     The Panel's Opinion misapprehends the nature of the Plaintiffs' argument regarding political gerrymandering.

VI.    The notarization requirement is a heavier burden for new parties.

VII.   In its analysis of the cumulative effect of the challenged laws and its application of the balancing test, the Opinion omits a full consideration of all the identified burdens on the Plaintiffs.

## ARGUMENT

In 2014, two Green Party candidates for Illinois state representative filed nominating petitions for the 115th and 118th Representative Districts.  The Defendants rejected the nomination petitions, stating in each case that the petition did not include a sufficient number of signatures under state statutes.

In the Southern District, the Plaintiffs filed constitutional challenges to the State's ballot access laws.

The District Court denied the Plaintiffs' Motion for Summary Judgment and granted the Defendants' Motion for Summary Judgment.  On October 6, 2017, the Panel issued its Opinion affirming the District Court.  The Plaintiffs hereafter describe several points overlooked or misapprehended by the Panel's Opinion.

### I. A 5%-minimum-signature requirement is not a safe haven–-it has been held to be unconstitutional by other courts, and under the circumstances in this case, it should be held unconstitutional here.

In declaring that signature-gathering requirement based on 5% of the number of voters who cast ballots in the last election is reasonable per se, the Panel both mischaracterizes the Supreme Court's opinion in *Norman v. Reed*, 502 U.S. 279 (1992), and relies on a body of older case law that has since been called into question. The Opinion states:

> "[T]he 5% signature requirement, standing alone, does not impose a severe burden on plaintiffs' constitutional rights. On multiple occasions, the Supreme Court has upheld signature requirements equaling 5% of the eligible voting base." Opinion, at 12, citing *Norman*, 502 at 282 n.2, 295.

But the Opinion mischaracterizes *Norman*.  *Norman* did not involve the state's 5% requirement but instead the alternative 25,000-signature requirement, which was a requirement "of slightly more than 2% of suburban voters."  *Norman*, 502 U.S. at 295.

In addition, the other cases cited in the Opinion on this point predate the Supreme Court's application of the "no litmus-paper test" principle, see *Storer v. Brown*, 415 U.S.

2

724, 730 (1974), and predate the Court's exposition of the balancing test in *Anderson v. Celebrezze*, 460 U.S. 780, 787 (1983), and *Burdick v. Takushi*, 504 U.S. 428, 438 (1992).

On Page 12, the Panel relies on its decision in *Libertarian Party of Ill. v. Rednour*, 108 F.3d 768, 773 (7th Cir. 1997), stating that the Court has previously rejected arguments that a 5% signature requirement is severe on its face. However, each case must be evaluated on its own; otherwise the 5% requirement becomes a litmus test.

The 5% cannot be per se reasonable because many courts have invalidated signature requirements of 5% or less. Eg., *Rockefeller v. Powers*, 78 F.3d 44 (2d Cir. 1996) (lesser of 5% of party voters or 1,250); *McLain v. Meier*, 637 F.2d 1139 (8th Cir. 1980) (3.3% of eligible signers); *Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340 (N.D. Ga. 2016) (1% of registered voters), *aff'd*, No. 16-11689 ((February 1, 2017) (unpublished order); *Hall v. Merrill*, 212 F. Supp. 3d 1148 (M.D. Ala. 2016) (for special election, 3% of voters in previous gubernatorial election); *Libertarian Party v. State Election Bd.* (W.D. Okla. 1984) (5% of total votes cast, in "only a 90-day window").

As an additional reason that the 5% requirement cannot be a safe haven or be used as a litmus test, the Plaintiffs point out that in the 115th District in 2010, *prior to* redistricting, the Green Party demonstrated support from the voters in a number more than 5 times the 5% threshold, and it is only the fact of redistricting that cost the party its established party status. This fact also undermines the very premise underlying Illinois's ballot access scheme: that gathering a large number of petition signatures from registered voters is an accurate way of gauging the degree of support for a political party from the voting populace. The record here demonstrates that there is a wide disparity between the degree of support for a party and its candidates in a given geographic area, based on the numbers who wish to cast a vote for that party, which is the core constitutional concern at issue, and the degree to which that same body of

voters includes sufficient numbers of people willing and able to gather an onerous number of petition signatures from voters, either by soliciting them at a limited number of public gatherings where it is possible to do so, or by soliciting their signatures door-to-door.

The Panel's Opinion, at 13, also references evidence of (a) one Green Party state representative candidate's successful ballot access *before* the 2011 redistricting and (b) two Green Party candidates' access and one independent candidate's access in three federal *congressional* districts in 2012.

But to rely on evidence of *pre-2011* Green Party ballot access for the conclusion that the state's ballot access laws are constitutionally acceptable misses the point of the Plaintiffs' claims, the supporting evidence, and the inferences drawn from it: the 2011 redistricting negatively impacted the Green Party's ability to access the ballot, and from the evidence presented, see *infra*, the inference can and should be drawn that the negative impact was intentional on the part of the legislature.

Reliance on petitioning successes in *congressional* districts, especially in 2012, the year after redistricting, when the signature requirement is approximately half or a third of the requirement in other years, is comparing apples and oranges.

On Page 14, the Panel's Opinion states,"The established party has already jumped the hurdle of receiving 5% of the vote in the last general election." But receiving 5% of the vote is virtually automatic when a candidate is the only candidate on the ballot or is one of only two parties on the ballot, as is nearly always the case in Illinois.

**II. If the State's interest in avoiding ballot overcrowding need not be supported by any empirical or other justifying evidence, then using it to reject a challenge to ballot access laws is using a litmus test.**

On Page 15 of its Opinion, the Panel quotes *Munro*:

"The Court has instead endorsed a policy that permits state legislatures 'to respond to potential deficiencies in the electoral process with foresight rather

than reactively.' " *Munro v. Socialist Workers Party*, 440 U.S. 173, 195 (1986).

However, the Panel's Opinion omits significant, relevant language at the end of the

quoted text from *Munro*. The sentence in *Munro* reads in full as follows:

> "Legislatures, we think, should be permitted to respond to potential deficiencies
> in the electoral process with foresight rather than reactively, *provided that the
> response is reasonable and does not significantly impinge on constitutionally protected
> rights*." *Munro*, 479 U.S. at 195-96 (emphasis added).

Plaintiffs point especially to *Munro's* use of the word "reasonable" and correspondingly

point to the record's uncontroverted evidence of the results of the state's ballot access

scheme:

> ➤ In the three Primary Elections since the 2011 redistricting, Illinois voters were
> faced with uncontested elections for state representative in 82.6%, 87.3%, and
> 89.4% of the contests, respectively.
>
> ➤ In the three General Elections since the 2011 redistricting , Illinois voters were
> faced with uncontested elections for state representative 60% of the time, and in
> only 1 of those 354 elections did more than two candidates appear on the ballot
> (in 2012, three candidates appeared on the 117th District ballot).

Where, as in this case, the State tamps down the constitutional rights of voters and new

parties and their candidates to such a degree that there exists the almost complete

opposite of ballot overcrowding, only one conclusion is supported: the ballot access

laws are overly restrictive and are not reasonable, and constitutional rights have been

significantly infringed.

The Plaintiffs note further that *Munro* was decided only in the context of a state

defending a fairly new ballot access restriction. In *Munro*, the ballot access restriction

had been passed in 1977, and the Socialist Workers Party had sued in 1985, only 8 years

later. But Illinois has had its 5% signature requirement in place since 1931, and so it is

no burden on the state to submit empirical evidence for such an old law.

Even in a case rejecting a constitutional challenge to ballot access laws, the Supreme

Court warned that the State may not put up ballot access barriers to a degree that results

in maintaining the status quo for the two major parties:

> "The second line of ballot access cases involves classification schemes that impose burdens on new or small political parties or independent candidates. These cases involve requirements that an independent candidate or minor party demonstrate a certain level of support among the electorate before the minor party or candidate may obtain a place on the ballot. In these cases, the Court has emphasized that the States have important interests in protecting the integrity of their political processes from frivolous or fraudulent candidacies, in ensuring that their election processes are efficient, in avoiding voter confusion caused by an overcrowded ballot, and in avoiding the expense and burden of run-off elections. To this end, the Court has upheld reasonable level-of-support requirements and classifications that turn on the political party's success in prior elections.
>
> The Court has recognized, however, that such requirements may burden First Amendment interests in ensuring freedom of association, as these requirements classify on the basis of a candidate's association with particular political parties. *Consequently, the State may not act to maintain the 'status quo' by making it virtually impossible for any but the two major parties to achieve ballot positions for their candidates.*"  *Clements v. Fashing*, 457 U.S. 957, 964-65 (1982) (plurality opinion) (emphasis added & internal citations omitted).

If simply uttering "avoid voter confusion and ballot overcrowding" is sufficient, without any historical or predictive evidence of voter confusion or ballot overcrowding, and in the face of strong evidence of the opposite of ballot overcrowding, then to accept the State's utterance of the words as the decisive factor is to use a litmus test.

On this issue, the Panel's Opinion, relying on *Navarro v. Neal*, 716 F.3d 425, 432 (7th Cir. 2004), states:

> "[T]he mere 'speculative concern that altering the challenged signature requirement would lead to a large number of frivolous candidates qualifying for the ballot and, consequently, voter confusion is sufficient." Opinion at 15-16.

However, other judges and courts have stated that evidence is required for State's interests to be entitled to significant weight, including (a) relatively recent concurring and dissenting opinions in a Supreme Court decision, which garnered the support of three Justices and two Justices, respectively, and (b) a federal Court of Appeals. *Crawford v. Marion Co. Election Bd.*,  553 U.S. 181 (2008) (Scalia, concurring in the judgment; Souter, dissenting); *Bergland v. Harris*, 767 F.2d 1551, 1554 (11th Cir. 1985);

6

*Fulani v. Krivanek*, 973 F.2d 1539, 1546 (11th Cir. 1992) ("The problem is that the state has plucked these interests from other cases without attempting to explain how they justify the discriminatory classification here at issue).

The Supreme Court decision is *Crawford v. Marion Co. Election Bd.*,  553 U.S. 181 (2008).  Justice Scalia's concurring opinion, joined by Justices Thomas and Alito, states:

> "But the ultimate valuation of the particular interest a State asserts has to take account of evidence against it as well as legislative judgments for it (certainly when the law is one of the most restrictive of its kind, see n. 26, supra ), and on this record it would be unreasonable to accord this assumed state interest more than very modest significance.
>
>                       ***
>
>     It should go without saying that none of this is to deny States' legitimate interest in safeguarding public confidence. The Court has, for example, recognized that fighting perceptions of political corruption stemming from large political contributions is a legitimate and substantial state interest, underlying not only campaign finance laws, but bribery and antigratuity statutes as well. *But the force of the interest depends on the facts (or plausibility of the assumptions) said to justify invoking it.*"  *Crawford*, 553 U.S. at 230, 235 (citations omitted) (emphasis added) (Scalia, concurring).

In *Crawford*, Justice Souter's dissenting opinion was joined by Justice Ginsburg and stated as follows:

> "The statute is unconstitutional under the balancing standard of *Burdick v. Takushi*, 504 U.S. 428 (1992): a State may not burden the right to vote merely by invoking abstract interests, be they legitimate, see ante, at 1616 – 1620, or even compelling, but must make a particular, factual showing that threats to its interests outweigh the particular impediments it has imposed." *Crawford*, 553 U.S. at 209 (Souter, dissenting).

That makes five of the nine Justices in *Crawford* whose too the position that something more than a mere speculative concern is necessary in order to give significant weight to a purported State's interest.

In addition, the Eleventh Circuit has held that the State must produce evidence of both the interests it asserts and the burdens it imposes.  *Bergland v. Harris*, 767 F.2d 1551, 1554 (11th Cir. 1985); accord *Fulani v. Krivanek*, 973 F.2d 1539, 1546 (11th Cir. 1992) ("The problem is that the state has plucked these interests from other cases without attempting

to explain how they justify the discriminatory classification here at issue); *Hall v. Merrill*, 212 F. Supp. 3d 1148 (M.D. Ala. 2016).

To be clear, the Plaintiffs do not contest that the State has an interest in regulating elections. But in order to comply with the *Anderson/Burdick* test, the Court must weigh that interest and determine the necessity for imposing the ballot access restrictions at issue. Without evidence to support the claimed needs to avoid voter confusion or to protect against ballot overcrowding, the weight to be given to the State's interest must be minimal, and thus insufficient to outweigh the burdens placed on the Plaintiffs in this case.

### III.   "Factual Dispute" Regarding District Boundaries in McLeansboro & Anna

The Panel's opinion , in Footnote 2 on Page 5, references a "factual dispute" regarding the redistricted boundaries for Anna and McLeansboro. The maps in the record show the splitting of these two population centers. (For McLeansboro,  R.442, 443; for Anna, R.439, 440.)  The textual descriptions of the boundaries (see 10 ILCS 91/20) show the 118th boundary going through two alleys in downtown McLeansboro [1] and the 115th boundary going through an alley in downtown Anna [2].

This evidence supplies additional support for the Plaintiffs' argument that the district boundaries were drawn in a discriminatory manner and that the ballot access scheme is unconstitutional.

---

[1]  http://www.elections.il.gov/Downloads/VotingInformation/PDF/2011Districts/ 2011RepDist118.pdf (midway through page 2 of textual description)

[2]  http://www.elections.il.gov/Downloads/VotingInformation/PDF/2011Districts/ 2011RepDist115.pdf (at bottom of page 1 of textual description)

**IV.    The Panel's Opinion overlooks additional evidence of discriminatorily drawn state representative district boundaries, understates other such evidence, and overstates other evidence.**

The record in this demonstrates that the Illinois legislature drew the 115th District boundaries to split three of the five largest communities in the district and drew the 118th District boundaries to split three of the seven largest communities in the district. These are the only state representative districts in the entire state to suffer such an extensive division of communities.

The Panel's Opinion omits mention of additional record evidence of the discriminatory nature of the gerrymandered district boundaries.  Specifically, the 115th district boundaries split the City of Carbondale, which was the home to the Green Party's previous gubernatorial candidate (Rich Whitney) and 115th District State Representative candidate (Charlie Howe), the redistricted boundaries gerrymandered Howe's residence out of the 115th, into the 118th, and separated Whitney's district from Howe's new district. Stated generally, the new boundaries split the city where, in 2010, two of the three most successful Illinois Green Party candidates resided.

The Opinion acknowledges on Page 7 that "all reasonable inferences are drawn in favor of the party against whom the motion at issue was made."

In this case, there is a reasonable inference to be drawn from this evidence—the division of Carbondale between two districts, the gerrymandering of the residence of the Green Party's 2010 state representative candidate into a different district, and the division of other communities in the 115th and 118th: the legislature intended to negatively impact ballot access for the Green Party in particular.

Finally, at the bottom of Page 26, the Opinion asserts that "even after redistricting, both the 118th and 115th districts boast population centers that far exceed the number of required petition signatures." It then gives the examples of Harrisburg, with

approximately 9,000 "residents," which is stated to be more than three and a half times the number of petition signatures Tripp was required to obtain, and of Murphysboro, with approximately 7,970 "residents," in suggesting that Shepherd could have easily obtained his signatures there.

Not only does this beg the question as to whether there were any significant public gatherings in these so-called population centers during the relevant time period, so as to make signature gathering a practical expenditure of time, the Panel's analysis suffers from the glaring flaw that Tripp and Shepherd cannot satisfy their signature-gathering requirements by petitioning "residents"–-their signatures must be from properly registered voters, 10 ILCS 5/10-4, 3-1.2,  the numbers of which are necessarily a fraction of the total population of each town.

**V. The Panel's opinion misapprehends the nature of the Plaintiffs' argument regarding political gerrymandering**.

Page 3 of the Opinion refers to Election Code requirements on new parties and immediately thereafter states, "Three such requirements are relevant here."  The Opinion refers to the 5% requirement, the 90-day petitioning period, and the notarization requirement.  But the district boundaries are also a part of the state's ballot access law, and the pleadings, evidence, and arguments have demonstrated that the redistricted boundaries negatively and discriminatorily impacted the Green Party.

From 2001 to 2010, the 115th and 118th State Representative Districts generally followed county lines.  However, with the 2011 redistricting, the State created boundary lines in the 115th District that divided counties *and* even communities.  In the current 115th District, the State divided three of the largest five communities between the 115th District and the 118th District.  Most notably, the district boundary line now runs right through the middle of Carbondale, the District's largest city by far, population-wise, and the home of the Green Party's previous gubernatorial and 115th District

10

Representative candidates.  The State gerrymandered the home of the Green Party's 2008 and 2010 115th State Representative candidate into a different district, away from the center of his support.  In the current 118th District, the State divided three of the seven largest population centers between two Districts.  As set out above, the boundaries now bisect alleys in downtown McLeansboro and downtown Anna.  And other communities were divided as well.

On Page 6, in referring to our cumulative-effect argument, the Panel refers to this issue of gerrymandered boundaries as the "geographic challenges."

The evidence presented is sufficient to infer that the legislature intended to disproportionately burden Green Party candidates.  The Plaintiffs do not make a stand-alone claim that the redistricting maps are unconstitutional.  The Plaintiffs' pleadings and argument about gerrymandering do not request that the redistricting map be thrown out.  Instead, the Plaintiffs have demonstrated burdens created by the redistricted boundaries that--when considered cumulatively with the 5% requirement, the 90-day petitioning period, the notarization requirement, the redistricting's division of communities, the gerrymandering of the Green Party's 2008 and 1020 state representative candidate out of the district, and the other burdens created by the new boundaries---are discriminatory, severe, and therefore unconstitutional.  Case law does not require that each or any of the individual burdens be unconstitutional individually before the cumulative effect can be considered unconstitutional.

**VI.    The Notarization Requirement is a Burden for New Parties**

The Opinion assumes, in several places, that new party circulators should be filling out a complete page, and the Opinion adopts the State's argument that the sheets could be 20 lines per page.  The Opinion does not acknowledge that circulators cannot be expected to fill each page to completion before turning them in and that some of the 34

or 31 circulators referred to did not turn in a full page of signatures.  The omission skews the math.

On Pages 27-28, the Opinion states that Tripp "employed" 34 separate circulators and Shepherd "utilized" 30. It then postulates that each Tripp circulator would have "only" had to obtain 71 signatures, and each Shepherd circulator 80, to meet the requirement. The Panel's analysis incorrectly suggests that the Green Party had sufficient resources to "employ" all the circulators, but even assuming that it was using the term "employed" broadly, as a synonym for "utilized," it would still be incorrect.

First, it fails to consider that each campaign would have to gather more than the minimum number of signatures in order to successfully resist a challenge, since inevitably some signatories would not be registered to vote or would not be registered at their current address.

Second, the Panel failed to consider that there are differing levels of commitment from people who volunteer to assist a petitioning effort. Circulators have full-time jobs, families, and other volunteer responsibilities. A person may decide that he or she wants to assist a candidate, but is only willing to obtain a few signatures from family and friends and is unwilling or unable to knock on doors or solicit signatures at fairs, farmers markets, or other public gatherings. Another person may want to help but is only available to do so for one, two, or three days during the entire petitioning period. Still others may have other limitations based on work schedule or other personal circumstances. Yet the Panel's analysis takes no account of such circumstances when it concludes that the Tripp and Shepherd campaigns had 34 and 30 "circulators," respectively. Instead it assumes that every individual who volunteered to gather even one signature is to be counted as a fully dedicated conscript for the entire petitioning period, for purposes of calculating how "few" signatures each "circulator" had to

obtain. Under the Panel's perverse rationale, future supporters of new parties may now have to forgo volunteering to gather just a few signatures, lest they be counted as full-time circulators for purposes of undermining any future legal challenges to a state's ballot-access laws.

The Plaintiffs note the Panel's reference to the free notary service provided by the City of Carbondale.  Opinion at 21. Not only is that city service only be available for limited hours, but that service amounts to one free notary service for the 4,618 square miles of the two state representative districts.

As for alternatives to the every-sheet notarization, the Plaintiffs have noted that a one-time notarization of a circulator's signature could be made on a listing of all the sheets circulated by that circulated. Candidates' nomination papers often include a similar listing on deletion sheets.

**VII.    Cumulative Effect & the Balancing Test**

> "The fact is that there are obvious differences in kind between the needs and potentials of a political party with historically established broad support, on the one hand, and a new or small political organization on the other . . . . Sometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike, a truism well illustrated in *Williams v. Rhodes*."  *Jenness v. Fortson*, 403 U.S. 431, 441-42 (1971).

Thus, having an exactly alike 90-day signature collection period for "new" and established parties operates to the great detriment of the "new" party.  Drawing district boundaries through communities will impact new parties to a greater degree than established parties.  Requiring notarizations on every sheet will impact a new party candidate to a greater degree than an established party candidate.  And the voter who clamors for more choices is the victim.

Two quotations from the Supreme Court that emphasize the significance of a state's ballot access restrictions:

> "Our primary concern is with the tendency of ballot access restrictions 'to limit

13

the field of candidates from which voters might choose.' Therefore, '[i]n approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters.' " *Anderson*, 460 U.S. at 786, quoting *Bullock v. Carter*, 405 U.S. 134, 143 (1972).

"If the challenged law burdens the rights of political parties and their members, it can survive constitutional scrutiny only if the State shows that it advances a compelling state interest and is narrowly tailored to serve that interest." *Eu v. San Francisco County Democratic Cent. Comm.*, 489 U.S. 214, 222 (1989) (internal citations omitted).

On pages 25-26 of the Opinion, the Panel makes the argument that the geographic sizes of the 115th and 118th districts "pale in comparison to representative districts found in other part of the United States," using a district in South Dakota and a district in Utah as a basis of comparison and introducing population density numbers, neither of which were brought up by the parties. The Plaintiffs have referred to the districts' geographic size *both* to show how difficult it is for a new party to petition in these districts *and* to show how the extraordinary division of population centers in these districts exacerbated the difficulty.

In addition, the two states mentioned have ballot access laws very different from Illinois. South Dakota and Utah both allow party petitions, and a group that successfully completes the party petition can then run candidates in all legislative districts. Both states require primaries for all qualified parties, even new ones. In South Dakota a member of a new party only needs 5 signatures of party members to get on his or her own party's primary to run for the legislature. S.D. Codified Laws § 12-5-1.4. In Utah all qualified parties have conventions before the primary and anyone who shows significant support at a convention either does not need to go thru the primary, or if two candidates show significant strength, neither one needs any signatures to be on the primary ballot. Utah Code Ann. § 20A-9-201.

As a part of the Plaintiffs' claim that the 2011 redistricting imposed a severe burden on the Plaintiffs, and that the new boundaries discriminated against the Green Party in

Southern Illinois, the Plaintiffs proved that the new 115th and 118th boundaries divided communities unlike in any other districts. The Plaintiffs' argument is that petitioning in a two-block area, for example, as for the smallest of state representative districts, is going to be much less time-consuming than petitioning in the 115th or 118th , even before the division of population centers.

The Panel Opinion references the 26th State Representative District as a comparison. That district has a population density of 14,012 per square mile, compared to the 115th District's 60 people per square mile and the 118th District's 38 people per square mile. Clearly, it will be more of a burden to petition in a district with only 60 or 38 people per square mile, and the burden is more severe when so many of the districts' largest population centers have been divided between districts.

In sum, the Plaintiffs have shown that Illinois's ballot access laws impose severe burdens on their constitutional rights and that the burdens are not outweighed by the State's generalized interests in regulating elections or avoiding ballot overcrowding.

In the words of the *Anderson* Court:

> "[T]he right to vote is `heavily burdened' if that vote may be cast only for major-party candidates at a time when other parties or other candidates are `clamoring for a place on the ballot.' " *Anderson*, 460 U.S. at 787 (quoting *Lubin v. Panish*, 415 U.S. 709, 716 (1974)).

## CONCLUSION

The Plaintiffs respectfully urge the Court to grant this petition for rehearing en banc.

Respectfully Submitted,

s/ Vito A. Mastrangelo
Vito A. Mastrangelo
Attorney for Plaintiffs-Appellants
PO Box 1253
Mt. Vernon, IL 62864
618-316-9886
VitoAMastrangelo@gmail.com

## CERTIFICATE OF FILING & SERVICE

All Case Participants Are CM/EMF Participants

I hereby certify that on October 23, 2017, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit, by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Vito A. Mastrangelo
Vito A. Mastrangelo
Attorney for the Plaintiffs-Appellants

Vito A. Mastrangelo, Attorney at Law
PO Box 1253
Mt. Vernon, IL 62864
618-316-9886
VitoAMastrangelo@gmail.com